UNITED STATES BANKRUPTCY COURT                    **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
_____
                                                :
In Re:                                          :
                                                :
Food Management Group, LLC,                     :        Case No. 04-22880 (ASH)
                                                :
                              Debtor            :        Chapter 11
_____       :


### MEMORANDUM OPINION AND ORDER DENYING MOTION TO REQUIRE THAT ADVERSARY COMPLAINT BE FILED UNDER SEAL


**APPEARANCES:**

WHITE, FLEISCHNER & FINO, LLP
Attorneys for Rattet, Pasternak & Gordon Oliver, LLP
140 Broadway, 36th Floor
New York, NY  10005

      Gil M. Coogler, Esq.
          Of Counsel

DRINKER BIDDLE & REATH LLP
Attorneys for Janice B. Grubin, Chapter 11 Trustee for Debtors
191 North Wacker Drive, Suite 3700
Chicago, IL  60606

      Warren von Credo Baker, Esq.
          Of Counsel

DIANA G. ADAMS
ACTING UNITED STATES TRUSTEE
33 Whitehall Street, 21st Floor
New York, NY  10004

      Richard C. Morrissey, Esq.
          Of Counsel

**MARTIN GLENN**
**United States Bankruptcy Judge**

Pending before the Court is a motion by a putative defendant seeking an order

pursuant to 11 U.S.C. § 107(b)(2) requiring that the chapter 11 trustee, Janice B. Grubin

("Grubin" or the "Trustee"), be required to file a proposed adversary complaint under

seal (the "Sealing Motion") (ECF Docket No. 933). The moving party is the law firm of

Rattet, Pasternak & Gordon Oliver, LLP ("Rattet"). Rattet and several of its partners are

among sixteen (16) putative defendants named in the adversary complaint. All matters

relating to the proposed adversary proceeding, including the Sealing Motion, were

transferred to me by Judge Hardin, who is handling the underlying chapter 11 case. For

the reasons provided below, the Sealing Motion is denied.

None of the other putative defendants joined the Sealing Motion, which was

opposed by Grubin and the U.S. Trustee. Initially, Rattet filed a separate motion seeking

permission to file the Sealing Motion under seal because exhibits to the Sealing Motion

included a draft of the adversary complaint. On January 24, 2007, the Court denied from

the bench the initial motion, instructed interested parties to file in the Court's public

records all papers relating to the Sealing Motion (except for the draft adversary

complaint), and instructed the Trustee's counsel to submit the adversary complaint to the

Court for *in camera* review. [1] Copies of the adversary complaint were also provided to

the U.S. Trustee and to counsel for the putative defendants. Rattet and Grubin agreed to

this procedure.

---

[1]    The Court directed that by January 31, 2007, Rattet publicly file the motion to seal the adversary
complaint with all exhibits to the motion attached *except* for the adversary complaint. Instead, Rattet filed
the motion to seal *with* the draft adversary complaint attached. While the draft adversary complaint is now
part of the public record, the issues raised by the Sealing Motion are not moot since the adversary
complaint could still be sealed.

Rattet argues that the adversary complaint should be sealed because it contains "scandalous or defamatory matter," *see* 11 U.S.C. § 107(b)(2); FED. R. BANKR. P. 9018(2), that will unfairly damage the firm's reputation. Having considered the briefs, and having reviewed *in camera* the adversary complaint, the Court now denies the Sealing Motion.

The proposed adversary complaint raises important issues bearing on the integrity and transparency of bankruptcy court proceedings, and the role that professionals play in insuring that the integrity of the proceedings is maintained. An adversary complaint, of course, contains only allegations, none yet proven. This opinion only resolves the Sealing Motion. It is clear from the briefing that Rattet (and presumably the other defendants) strongly contest the factual and legal bases for the claims asserted in the adversary complaint. Resolving those questions must be left for another day.

## I.  Background

On June 1, 2004, the Debtor Food Management Group, LLC filed a voluntary petition for reorganization pursuant to chapter 11 of the Bankruptcy Code. On June 2, 2004, the Debtors KMA I, Inc., KMA II, Inc., KMA III, Inc. and Bronx Donut Bakery, Inc. (collectively, where appropriate, the "Debtors" or "FMG") respectively filed voluntary petitions for reorganization pursuant to chapter 11 of the Bankruptcy Code. FMG was, prior to the sale of its assets to TBG Food Acquisition Corp. ("TBG"), engaged in the business of managing approximately twenty four (24) Dunkin Donuts franchises, which were owned and operated by the Debtors KMA I, Inc., KMA II, Inc. and KMA III, Inc. The Debtor Bronx Donut Bakery, Inc. is engaged in the business of operating a cooperative food production facility, servicing the franchises owned by the

KMA Debtors and non-related Dunkin Donuts franchises in the local area.  Rattet previously served as counsel to the Debtors in the chapter 11 case from the initial filings in June 2004 until September 2005, when Rattet was ordered by Grubin to have no further involvement in the case.

It is fair to say that Debtors' chapter 11 case has been troubled from the start. Most of the details are unnecessary for an understanding of the current dispute.  The basic facts, taken from the moving and responding briefs and from docket entries in the chapter 11 case, appear not to be in dispute.

Even before the chapter 11 case was filed, FMG was embroiled in several lawsuits that threatened its continued existence.  FMG was owned by members of the Gianopoulos family.  Beginning on January 28, 2002, the Gianopouloses and the Dunkin Donuts franchisor, Dunkin' Donuts Incorporated ("Dunkin' Donuts"), were parties to a lawsuit in federal court in White Plains, New York.  The lawsuit was resolved with the "Dunkin Donuts Settlement Agreement," dated October 18, 2002, which, among other things, contemplated the sale of FMG's 24 Dunkin Donuts franchises no later than July 31, 2005.

Beginning on February 13, 2004, FMG was also a party to a lawsuit with QuesTech Financial, LLC ("QuesTech") in federal court in White Plains.  QuesTech was a secured lender to FMG and QuesTech claimed that FMG had converted the collateral securing its loans.  On May 21, 2004, after an evidentiary hearing, Judge Colleen McMahon granted QuesTech's motion and appointed a temporary receiver, *pendente lite*. FMG responded by filing its chapter 11 petition on June 1, 2004.

4

On June 10, 2004, QuesTech moved the bankruptcy court for the appointment of a trustee (ECF Docket No. 24). On July 12, 2004, Judge Hardin denied the motion to appoint a trustee, but he ordered the U.S. Trustee to appoint an Examiner to investigate the conduct of Debtors and their principals (ECF Docket No. 53).

After the chapter 11 case was filed, Dunkin' Donuts − unwilling to permit the Debtors to continue as franchisees so long as the Gianopouloses remained involved in any way in the business − sought to enforce the terms of the Dunkin Donuts Settlement Agreement that contemplated the sale of FMG's franchises no later than July 31, 2005. Therefore, the effort to salvage substantial value from the Debtors' business required a sale of the business without any continuing involvement by the Gianopouloses. Dunkin' Donuts had the contractual right to approve any purchaser before the sale could be completed.

On January 11, 2005, the Debtors filed a motion for authorization to conduct an auction of substantially all of Debtors' property free and clear of all liens, claims and encumbrances pursuant to 11 U.S.C. §§ 105, 363(a) and (b) and 365 and FED. R. BANKR. P. 2002, 6004 and 6006, etc. ("Auction Motion") (ECF Docket No. 201). The Auction Motion also included Bidding Procedures and an Offer & Bidder Registration Form. The Bidding Procedures and the Bidder Registration Form required each bidder to certify that the Gianopouloses would have no involvement with the ongoing business. On February 22, 2005, the Auction Motion (including the Bidding Procedures) was granted (ECF Docket No. 241).

Pursuant to the Bidding Procedures, a "Qualified Bidder" was required to submit an executed, irrevocable contract, a completed Bidder Registration Form and a deposit of ten percent (10%) of the bid amount to Rattet.  The Bidding Procedures also contemplated a "stalking horse bid," intended to elicit higher bids, with a negotiated break-up fee in the event the stalking horse bid was topped.

ZPG Restaurant Associates, LLC, and a related party, the Matrix Group ("ZPG/Matrix"), expressed an interest in purchasing all of the Debtors' assets for $16,000,000, and to be designated as a "stalking horse" bidder.  ZPG/Matrix requested a break-up fee of 2.5% of its bid in the event that it was not the ultimate successful purchaser of the Debtors' assets.  On March 18, 2005, ZPG/Matrix executed (1) a contract of sale for the purchase of all of the Debtors' assets for $16,000,000 and (2) an Offer & Bidder Registration Form.  It also deposited $1,600,000 in escrow with Rattet. ZPG/Matrix demanded, as a condition of its "stalking horse" bid, that the contract of sale be countersigned by the Debtors on that day.  On that same day, the Court granted an application to permit Robert L. Rattet, Esq., a partner in the Rattet firm, to sign the contract with ZPG/Matrix as attorney in fact for Debtors (ECF Docket No. 274).  The Court also scheduled a March 24, 2005 hearing on the amount of the ZPG/Matrix break-up fee.

Beginning in February or early March 2005, there was at least one other party interested either in bidding or otherwise participating in the Debtors' reorganization. Thomas R. Borek, whose businesses included Newell Funding LLC and 64 East 126th Street, LLC ("64 East"), and who had previously provided financing to the Gianopouloses, explored several alternatives for his participation.  On or about March 1,

2005, Borek expressed an interest in purchasing all of the Debtors' assets in accordance

with all of the auction terms.  Borek and Robert Rattet, who had been close friends for

many years, met to discuss the auction process and bidding procedures.  On March 22,

2005, for reasons that are unclear, Rattet hand-delivered a letter to Borek (which Rattet

refers to as the "Warning Letter"), reiterating that the Gianopouloses could have no

involvement in any purchasing entity.  The next day, on March 23, 2005, one day before

the Court hearing on the ZPG/Matrix break-up fee, 64 East submitted to Rattet an auction

bid in the amount of $21,000,000, and made the required escrow deposit of $2,100,000.

It is undisputed that 64 East's bidding submission did *not* include a completed Offer &

Bidder Registration Form; hence, no certification as to the absence of involvement by the

Gianopouloses was provided.

   At the Court hearing on March 24, 2005, with the new higher bid in hand, Rattet

asked the Court to approve 64 East's $21 million bid as the stalking horse bid (instead of

the ZPG/Matrix $16 million bid), and also to approve a break-up fee for 64 East in the

event its bid was topped.  On March 31, 2005, the Court approved the 64 East bid,

including a break-up fee of $250,000 for 64 East, and of $50,000 for ZPG/Matrix, in the

event that either was not the ultimate successful purchaser.  The Court was *not* advised

that 64 East failed to provide the required certification regarding the absence of

involvement by the Gianopouloses.  As it turned out, the Gianopouloses were very much

involved in the 64 East bid.

   Following the March 24, 2005 hearing, ZPG/Matrix withdrew its $16,000,000

offer, and its deposit of $1,600,000 was returned to it.  On April 15, 2005, Matrix then

made a new $26,770,000 offer that included cash of $24,000,000, and other

consideration.  Matrix submitted to Rattet a new executed contract of sale and a deposit check of $2,400,000.  Having now had its bid topped, 64 East sought the return of its $2,100,000 escrow deposit.  The parties now dispute how the return of the 64 East escrow deposit came about, facts that are likely to be contested in the adversary proceeding, but the deposit was returned to 64 East on December 8, 2005.

Dunkin' Donuts rejected Matrix as a purchaser, and after an evidentiary hearing on June 29, 2005, the Court found that the rejection was reasonable.  When the Matrix transaction failed, efforts were renewed to complete a transaction with 64 East, as the second highest bidder.  Dunkin' Donuts was asked to approve 64 East as a purchaser of the Debtors' franchises.  In July 2005, it appears that Dunkin' Donuts refused to give approval to the proposed sale to 64 East after a background check of Borek revealed a criminal record.  Rattet then sought unsuccessfully to negotiate a sale of assets to TBG.

After the events recounted above with regard to the efforts to auction Debtors' assets, on September 1, 2005, Judge Hardin granted the motion of the Examiner for appointment of a trustee, and on September 2, 2005, Judge Hardin approved the appointment by the U.S. Trustee of Janice B. Grubin as the chapter 11 trustee pursuant to 11 U.S.C. §1104.  Immediately upon her appointment as trustee, Grubin demanded turnover of the Rattet firm's files on the Debtors' chapter 11 case, and instructed that Rattet have no further involvement in the case.  The Trustee also successfully negotiated a contract to sell the Debtors' assets to TBG for $18 million.

In early March 2006, the Court directed Grubin to investigate the *bona fides* of 64 East's bid.  On March 15, 2006, the Court made public a letter dated March 24, 2005, from

the Gianopouloses to 64 East, reciting that "[w]e have requested that you act as the

Purchaser" of FMG's assets.  It also stated that Borek's entity, Newell Funding LLC,

loaned $2,600,000 to the Gianopouloses, who directed that $2,100,000 of the proceeds in

turn be loaned to Borek's entity, 64 East, to utilize as its deposit supporting its $21

million bid.  The letter provided that the break-up fee that would be due in the event 64

East's bid was topped would be split, with 64 East keeping $50,000 and the balance

being paid to entities controlled by the Gianopouloses.[2]

By Order dated April 4, 2006, the Court authorized Grubin to conduct an

investigation pursuant to FED. R. BANKR. P. 2004 of the facts and circumstances relating

to the 64 East bid (ECF Docket No. 683).  Following that investigation, Grubin prepared

the proposed adversary complaint seeking to recover damages allegedly suffered by

Debtors as a result of the events surrounding the proposed auction of the Debtors' assets.

Grubin provided a draft of the adversary complaint to Rattet.  Unsuccessful discussions

ensued between Rattet and Grubin in an effort to resolve the matter without the filing of

the complaint.  The present motion, seeking to require Grubin to file the adversary

complaint under seal, then followed.

The adversary complaint asserts claims against various defendants for fraudulent

---

[2]        The letter further provided as follows:

"It is understood that in connection with the bankruptcy proceedings referenced in the Contract,
should the Court, Trustee or any creditor of the Debtor, inquire of the relationship between us
and/or Newell Funding LLC . . . , or the matters surrounding this transaction and our participation,
that you will make true and complete disclosure, including, the advancement of the deposit under
the Contract and any other agreement that we may in the future enter into that pertains to this
matter."  (ECF Docket No. 933 Ex. 4.)

The Trustee contends that "true and complete disclosure" was required by any interested party with
knowledge of the agreement without waiting for inquiry from the Court.  The adversary complaint alleges
that Rattet, among others, had "notice or knowledge" of the agreement and breached its fiduciary duty and
committed fraud on the court by failing to disclose the facts.

concealment, conspiracy to commit fraudulent concealment, breach of fiduciary duty,

conspiracy to breach fiduciary duty, aiding and abetting breach of fiduciary duty, unjust

enrichment, negligence, and fraud on the court.  In addition to Rattet, the adversary

complaint names as defendants Anastasios Gianopoulos, Constantine Gianopoulos,

Anastasia (a/k/a Anne) Gianopoulos, Anastasia (a/k/a Stacey) Gianopoulos, 64 East 126th

Street LLC, Newell Funding LLC, Golden Age Mortgage Corp., Development Strategies

Company, LLC, Thomas R. Borek, Robert J. Stockel, Robert L. Rattet, Jonathan S.

Pasternak, Alan H.Rothschild, Rothchild & Pearl, LLP, and Nodine Realty Corporation.

For the most part, the adversary complaint contains a straight-forward recitation of facts,

supported by numerous exhibits that document what transpired with respect to the

auction, and the role each of the defendants allegedly played in those events.

    With respect to Rattet, the charging allegations of the adversary complaint can be

summarized as follows:  Rattet was retained to represent the Debtors in the chapter 11

case.  As required by FED. R. BANKR. P. 2014(a), on June 4, 2004, Rattet submitted with

its application to be appointed as counsel an affidavit of no adverse interest (ECF Docket

No. 5).[3]  According to the adversary complaint, Rattet failed to disclose its prior

representation of Nodine Realty, an entity owned or controlled by the Gianopouloses, in

Nodine's November 2002 bankruptcy filing.  The adversary complaint describes the facts

regarding the failed auction, as recounted above, and alleges that Rattet as well as other

defendants had "notice or knowledge," but failed to disclose to the Court, that the

---

[3]    FED. R. BANKR. P. 2014(a) provides, in pertinent part, that "[t]he application shall be
accompanied by a verified statement of the person to be employed setting forth the person's connections
with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United
States trustee, or any person employed in the office of the United States trustee."

Giaopouloses were involved in the 64 East bid, despite the prohibition of any

involvement on their part.  The adversary complaint also alleges that Rattet failed to

inform the Court of Rattet's "connections" with Borek,[4] *see* FED. R. BANKR. P. 2014(a),[5]

and of the absence of the Bidder Registration Form from 64 East.[6]  As counsel for the

Debtors, the Trustee contends, Rattet had a fiduciary duty to the Debtors and to the Court

to disclose this information.

After Dunkin' Donuts rejected 64 East as a purchaser, the adversary complaint

alleges, Rattet took steps in furtherance of Borek's interests to cancel the contract and

have 64 East's $ 2.1 million deposit returned to it.  On or about July 8, 2005, allegedly

without the Trustee's knowledge, Rattet drafted a stipulation that purported to release 64

---

[4]      The adversary complaint alleges that after Borek expressed an interest in purchasing FMG's assets in early March 2005, and met with Rattet to obtain more information about the bidding procedures, Rattet failed to disclose that, dating back as early as 2001 and continuing during the Debtors' chapter 11 case, Rattet also provided legal services to Borek and various entities owned or controlled by him.

On the other hand, the Sealing Motion contends that Rattet *did* disclose the relationship with Borek: "Following the *in camera* disclosure by Mr. Rattet that he was a long-time friend of Mr. Borek and previous attorney for certain of his entities, Mr. Rattet recused himself from the discussions concerning the breakup fee, in view of his long-time, close friendship with Thomas Borek, the principal of 64 East, in the event its bid was not the highest and best bid."  Sealing Motion ¶ 28, at 9.

[5]      It appears that Borek was not a party in interest when the Debtors commenced the chapter 11 case. Although Rule 2014(a) does not expressly require a supplement to a professional's initial disclosure, "§ 327(a) implies a duty of continuing disclosure, and requires professionals to reveal connections that arise from their retention."  *In re Granite Partners, L.P.*, 219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998) (cases collected); *see Rome v. Braunstein*, 19 F.3d 54, 57-58 (1st Cir. 1994) ("[T]he need for professional self-scrutiny and avoidance of conflicts of interest does not end upon appointment.").  Furthermore, § 328(c) of the Bankruptcy Code provides that for professionals to receive compensation they "must maintain their disinterestedness and refrain from representing or holding an interest adverse to the estate . . . ."  *In re Caldor, Inc-NY*, 193 B.R. 165,176 (Bankr. S.D.N.Y. 1996).  Therefore, a professional's continuing disclosure of conflicts under Rule 2014(a), although not explicit in the rule, is necessary to preserve the integrity of the bankruptcy system and to ensure that professionals remain "conflict free."  *In re Granite Partners*, 219 B.R. at 35.  Whether Rattet made timely and adequate disclosure of its "connections" with Borek is not presented by the Sealing Motion or decided by the Court.

[6]      The Sealing Motion states that the "failure to obtain an executed Offer & Bidder Registration form from 64 East or its counsel . . . concededly, was an administrative oversight that was unintentional and inadvertent."  Sealing Motion ¶ 30, at 10.

11

East from all its rights and obligations under the contract, provided for the return of the $2.1 million deposit, and awarded 64 East the $250,000 break-up fee.  The Examiner refused to enter into the stipulation.  The adversary complaint also alleges that on December 8, 2005, unaware that 64 East's $2.1 million deposit was funded by the Giaopouloses, or of Rattet's efforts to get the 64 East deposit returned, the Trustee returned 64 East's deposit to its bankruptcy counsel.[7]

**II. The Sealing Motion**

Rattet has moved pursuant to 11 U.S.C. § 107(b)(2) to require that the adversary complaint be filed under seal.  Section 107(a) of the Code provides that "a paper filed in a case under this title and the dockets of a bankruptcy court are public records and open to examination by an entity at reasonable times without charge."  Section 107(b) recognizes exceptions to this policy that everything filed in bankruptcy court is a public record. Section 107(b)(1) provides protection for "a trade secret or confidential research, development, or commercial information"; § 107(b)(2) provides that the bankruptcy court shall "protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title."[8]  Rattet seeks to invoke § 107(b)(2), arguing that the adversary complaint contains "scandalous or defamatory matter," and that Rattet will be damaged if the adversary complaint is made public.  Grubin and the U.S. Trustee oppose the motion, arguing that Rattet has failed to meet the high threshold required to seal a paper.  The Court agrees that Rattet has failed to meet the requirements for sealing.

---

[7]     The Sealing Motion contends that the Trustee was at fault for returning 64 East's $2.1 million escrow deposit without seeking the entry of a court order.  *See* Sealing Motion ¶ 42, at 13.

[8]     In addition, § 107(c), added to the statute in 2005, provides protection for information that might make an individual vulnerable to identity theft.

### III. Discussion

#### A. Strong Public Policy of Open Access to Court Records

There is a strong presumption and public policy in favor of public access to court records. *See, e.g., Nixon v. Warner Commc'n, Inc.*, 435 U.S. 589, 597-98 (1978); *Neal v. The Kansas City Star (In re Neal)*, 461 F.3d 1048, 1053 (8th Cir. 2006); *Gitto v. Worcester Telegram & Gazette Corp. (In re Gitto Global Corp.)*, 422 F.3d 1, 6 (1st Cir. 2005); *In re FiberMark, Inc.*, 330 B.R. 480, 505 (Bankr. D. Vt. 2005). The right of public access is "rooted in the public's First Amendment right to know about the administration of justice." *Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.)*, 21 F.3d 24, 26 (2d Cir. 1994) (public access "helps safeguard 'the integrity, quality, and respect in our judicial system,' and permits the public 'to keep a watchful eye on the workings of public agencies'") (citations omitted). The public interest in openness of court proceedings is at its zenith when issues concerning the integrity and transparency of bankruptcy court proceedings are involved, as they are in this matter. *Gitto*, 422 F.3d at 7 ("This governmental interest is of special importance in the bankruptcy arena, as unrestricted access to judicial records fosters confidence among creditors regarding the fairness of the bankruptcy system."); *In re Bell & Beckwith*, 44 B.R. 661, 664 (Bankr. N.D. Ohio 1984) ("This policy of open inspection, established in the Bankruptcy Code itself, is fundamental to the operation of the bankruptcy system and is the best means of avoiding any suggestion of impropriety that might or could be raised.").

#### B. Section 107 Codifies Public Access to Bankruptcy Court Records

Courts have recognized that § 107 "codified the Supreme Court's *Nixon* decision

in the bankruptcy setting by recognizing the common-law right of public access . . . ."

*Phar-Mor, Inc. v. Defendants Named Under Seal (In re Phar-Mor)*, 191 B.R. 675, 679

(Bankr. N.D. Ohio 1995); *see also Orion Pictures Corp.*, 21 F.3d at 26 ("policy of open

inspection, codified generally in § 107(a) of the Bankruptcy Code, evidences congress's

[sic] strong desire to preserve the public's right of access to judicial records in

bankruptcy proceedings").  The plain meaning of § 107(a) mandates that *all* papers filed

with the bankruptcy court are "public records" unless the bankruptcy court "decides to

protect the information pursuant to the standards set forth in section 107(b) . . . ."  *Air line*

*Pilots Ass'n Int'l v. Am. Nat'l Bank and Trust Co.* (*In re Ionosphere Clubs)*, 156 B.R.

414, 433 n.7 (S.D.N.Y. 1993).

FED. R. BANKR. P. 9018 implements the protection provided by § 107(b).  The

Rule provides that:

> On motion or on its own initiative, with or without notice, the court may
> make any order which justice requires (1) to protect the estate or any entity in
> respect of a trade secret or other confidential research, development, or
> commercial information, (2) to protect any entity against scandalous or
> defamatory matter contained in any paper filed in a case under the Code, or (3) to
> protect governmental matters that are made confidential by statute or regulation.
> If an order is entered under this rule without notice, any entity affected thereby
> may move to vacate or modify the order, and after a hearing on notice the court
> shall determine the motion.

Section 107(b) establishes an exception to the general right of access where under

"compelling or extraordinary circumstances" an exception is necessary.  *See Orion*

*Pictures Corp.*, 21 F.3d at 27 ("Congress, itself, has recognized that under compelling or

extraordinary circumstances, an exception to the general policy of public access is

necessary.")  However, "[i]n most cases a judge must carefully and skeptically review

sealing requests to insure that there really is an extraordinary circumstance or compelling

14

need" to keep this material private. *Id.* (sealing official documents should not be done

without a compelling reason) (citing *City of Hartford v. Chase*, 942 F.2d 130, 135-136

(2d Cir. 1991)).  Section 107(b) is not intended to save the debtor or creditors from

embarrassment.  *In re Muma Services Inc.*, 279 B.R. 478, 484 (Bankr. D. Del. 2002)

("[Section 107(b) is not] intended to save the debtor or  its creditors from embarrassment,

or to protect their privacy in light of countervailing statutory, constitutional and policy

concerns.") (citations omitted); *see also* 2 COLLIER ON BANKRUPTCY ¶107.3 (Alan N.

Renick & Henry J. Sommer eds., 15th ed. 2006) (stating that this limitation must be

viewed as an extraordinary measure only warranted in rare circumstances; "mere

embarrassment, or harm to reputation based on [disclosure of] nonscandalous,

nondefamatory information is [insufficient]"; "the dissemination of merely prejudicial

material cannot be enjoined under the provision") (cases collected).

Adopted by Congress in 1978, § 107 made an important change in the common

law regarding public access to bankruptcy court records.  It is no longer left to the

bankruptcy court to balance the interests of the public and private parties in determining

whether to seal records from public view.  Under § 107(a), unless a paper filed in a

bankruptcy court falls within one of the express exceptions in § 107(b) or (c), it must be

open to public inspection.  On the other hand, if a paper falls within one of the express

exceptions in § 107(b), on the request of a party in interest, the bankruptcy court *shall*

protect a person.  The exceptions are more circumscribed than the range of matters that

could be protected at common law, but at the same time, protection is required rather than

simply left to the discretion of the bankruptcy court.  *Gitto*, 422 F.3d at 8 ("Absent § 107,

this question would be addressed by reference to the common law.  Because § 107 speaks

directly to the question of public access, however, it supplants the common law for

purposes of determining public access to papers filed in a bankruptcy case.  Therefore,

'issues concerning public disclosure of documents in bankruptcy cases should be

resolved under § 107,' . . . not under the common law.") (citation omitted); *Orion*

*Pictures Corp.*, 21 F.3d at 27 ("Thus, if the information fits any of the specified

categories, the court is *required* to protect a requesting interested party and has no

discretion to deny the application.") (emphasis in original).  In this case, if Rattet

establishes that a paper that the Trustee seeks to file contains "scandalous or defamatory

matter," the Court shall "*protect*" Rattet, although what protection must be granted is not

commanded by the statute.  The Court no doubt would enjoy discretion in deciding how

to protect Rattet.  *Gitto*, 422 F.3d at 9 ("It is true that § 107(b)(2) speaks of protection in

general terms rather than of wholesale sealing, and that courts must therefore exercise

some discretion in determining what form of protection to grant.").  But the Court would

only need to reach that issue if it first concluded that the proposed adversary complaint

contains scandalous or defamatory matter.  As explained below, the Court concludes that

the adversary complaint does not contain scandalous or defamatory matter and, therefore,

Rattet is not entitled to any relief.

### C.  Section 107(b)(2) Protects Against Scandalous or Defamatory Matter

Section 107(b)(2) does not define what is meant by "scandalous or defamatory

matter."  Congress did not define these terms in the statute or the legislative history.

Several courts have considered the meaning of the terms and have arrived at somewhat

different definitions or have applied different standards for determining whether relief

should be afforded.[9]

The First Circuit in *Gitto*, confronted with a request to seal pursuant to §

107(b)(2), described the issue as one of first impression in the circuit.  *Gitto*, 422 F.3d at

4.  The court rejected the analytical framework used by the bankruptcy court and then

modified by the district court, although all three courts reached the same result in the case

– rejecting a motion to seal an examiner's report that allegedly contained defamatory

matter.

The appellants in *Gitto* were previously associated with a chapter 11 debtor.  They

asserted that an investigative report compiled by a court-appointed examiner should be

redacted or filed under seal because the report contained scandalous and defamatory

matter under §107(b)(2).[10]  The examiner was appointed to investigate the existence of

any pre-petition "fraud, dishonesty, incompetence, misconduct, mismanagement, or

irregularity in the management and business affairs of the Debtor."  *Id.* at 5.  The former

CEO and chairman of the Debtor filed a motion to seal under § 107(b)(2) claiming that

the presumption of public access did not apply because the report contained scandalous

and defamatory matter.

The court of appeals began it's analysis of § 107(b)(2) by clearly stating that

papers filed with the court did not fall within the exception "merely because they would

---

[9]      In *Orion Pictures Corp.*, 21 F.3d 24, the Second Circuit addressed the meaning and application of
§ 107(b)(1) dealing with the terms "trade secret" and "commercial information."  *See also Geltzer v.
Andersen Woldwide, S.C.*, 05 Civ. 3339, 2007 WL 273526, at * 3 (S.D.N.Y. Jan. 30, 2007) (refusing to
approve settlement that was redacted to exclude the settlement amount; rejecting claim that the amount was
protected as "commercial information" under § 107(b)(1)).  The Second Circuit has not dealt with the
meaning or standards applicable to § 107(b)(2); nor have any district or bankruptcy courts in this district.

[10]      The court only focused on the "defamatory" prong within § 107(b)(2) because on appeal the
appellants did not attempt to demonstrate that the report was scandalous, nor did they provide a possible
definition for the "scandalous" prong.  *Gitto*, 422 F.3d at 8 n.6.

have a detrimental impact on an interested party's reputation." *Id.* at 11.  The court

concluded that an additional showing was required, but that since the nature of this

additional showing was not apparent from the language of the statute or the legislative

history, it was left to the court to define the contours of the exception.  *Id.*  Further, the

court stated that "the case law and the interpretation of sources analogous to § 107(b)(2)

support[ed] a context sensitive approach to the exception." *Id.* at 13.  In holding that the

appellants were not entitled to protection under §107(b)(2), *Gitto* announced the standard

for protection as follows:

> To qualify for protection under the § 107(b)(2) exception for defamatory material,
> an interested party must show (1) that the material at issue would alter his
> reputation in the eyes of a reasonable person, and (2) that the material is untrue or
> that it is potentially untrue and irrelevant or included for an improper end.

*Gitto,* 422 F.3d at 16-17.

In reaching this conclusion, the court determined that although some of the

statements in the report could be *potentially* untrue, the remaining elements of the test,

that the material was irrelevant or was included for improper ends, could not be

established.  Therefore, the appellants did not qualify for protection and the report was

filed publicly.

The court of appeals accepted the district court's description of the test applied by

the bankruptcy court as holding that "appellants, in order to enjoy the protection of §

107(b)(2), must demonstrate that material in the Report is untruthful." *Id.* at 11.  The

court of appeals concluded that a court "may" grant protection under § 107(b)(2) based

on a showing of untruthfulness, but it found the bankruptcy court's test "largely

unworkable" because statements in a court filing are usually disputed, and it "would be

unrealistic to require the bankruptcy court to resolve these factual disputes at a preliminary stage of the proceedings.  The untruthfulness requirement would add an enormous burden to the bankruptcy courts' already heavy docket by turning motions for protection under § 107(b)(2) into an occasion for mini-trials."[11]  *Id.*  Therefore, the court of appeals engrafted into the standard for protection an additional category of "*potentially untrue* material that would cause a reasonable person to alter his opinion" of the proponent, and would be entitled to protection under § 107(b)(2) if an additional showing is made that "the material is potentially untrue and irrelevant or included within a bankruptcy filing for an improper end."  *Id.* at 14.

I find the *Gitto* court's test for protection against "*potentially* untrue material" to be unsupported by the language of the statute and unnecessary to achieve an appropriate level of protection.  While any test that required a mini-trial to determine whether a challenged statement is untrue would be unworkable, that does not justify expanding mandatory protection under § 107(b)(2) to cover statements that are potentially untrue.  As explained below, the protection against "scandalous" matter provided by §107(b)(2) already incorporates *Gitto*'s addendum for challenged statements that are "irrelevant" or "included for an improper end."  *See* Section III.C.1., *infra,* at 21.  In this Court's view, protection against "defamatory matter" only applies for statements that are untrue, and that can be clearly shown to be untrue without the need for discovery or a mini-trial.[12]  Section 107(a) creates a strong presumption that court records are public; only clear

---

[11]      The court of appeals limited protection for a showing of untruthfulness under section 107(b)(2) to "the rare case where the untruthfulness is readily apparent."  *Gitto,* 422 F.3d. at 11.

[12]      *Gitto* recognized that "[b]ankruptcy courts are under no obligation to resolve questions of truthfulness presented by a § 107(b)(2) motion where doing so would require discovery or additional hearings, or would be otherwise burdensome."  *Gitto,* 422 F.3d at 11.

evidence of impropriety can overcome the presumption and justify protection under §
107(b)(2).[13]

Scandalous and defamatory material under § 107(b)(2) has been defined as
"material that would cause a reasonable person to alter their opinion of a party based on
the statements therein, taking those statements in the context in which they appear."[14] *In
re FiberMark, Inc.*, 330 B.R. at 507 (quoting *In re Phar-Mor*, 191 B.R. at 679). As
explained in Section III.C.1. & 2., *infra*, at 21, 25, under § 107(b)(2), protection against
"scandalous matter" does not depend on whether the statement is true; protection against
"defamatory matter" only applies when the statement is untrue.

In *FiberMark*, two committee members of the Official Committee of Unsecured
Creditors sought to keep a court-appointed examiner's report under seal because it
included conclusions that the moving committee members breached fiduciary duties to
the chapter 11 debtor.[15] In finding that the report did not satisfy the § 107(b)(2)
exception, Judge Colleen Brown held that the seal proponent's allegations that the
examiner went too far and that the conclusions were not supported by the facts, went to

---

[13]     There are other strong sanctions that a court may impose if improper matter is included in court
filings. *See, e.g.*, FED. R. CIV. P. 11; 28 U.S.C. § 1927. *See also Schlaifer Nance & Co. v. Estate of
Warhol*, 194 F.3d 323, 336 (2d Cir. 1999) (stating that in order to impose sanctions pursuant to its inherent
power, a district court must find that: 1) the challenged claim was without colorable basis, and 2) the claim
was brought in bad faith, *i.e.*, motivated by improper purposes such as harassment or delay); *Sussman v.
Bank of Israel*, 56 F.3d 450, 459 (2d Cir. 1995) (stating that a court has the inherent power to supervise and
control its own proceedings and to sanction counsel or a litigant for bad faith conduct).

[14]     "Scandalous matter" is defined in Black's Law Dictionary as "matter that is both grossly
disgraceful (or defamatory) and irrelevant to the action or defense." BLACK'S LAW DICTIONARY 623 (2nd
pocket ed. 2001). A "defamatory" statement is defined as "([o]f a statement or communication) tending to
harm a person's reputation, by subjecting that person to public contempt, disgrace, or ridicule, or by
adversely affecting the person's business." BLACK'S LAW DICTIONARY 184 (2nd pocket ed. 2001).

[15]     The seal proponents alleged that the examiner's language in the report was "inflammatory,
defamatory, and intemperate." *In re FiberMark*, 330 B.R. at 507. But the court found no evidence in the
record to persuade it that the examiner's word choice was "malicious or capricious." *Id.* at 508.

the merits of the report and were irrelevant to the §107(b)(2) inquiry because those issues

would properly be addressed by the court if and when it was confronted with the merits

of the examiner's conclusions.  *Id.* at 507-08.  Furthermore, the court found that the

private interest of protecting attorneys and other professionals from presumably valid

criticism was *de minimus* because they were capable of rebutting and refuting the

assertions made against them.  *Id.* at 508.

Although both *Gitto* and *FiberMark* analyzed the application of § 107(b)(2) in the

context of an examiner's report, the analysis applies with equal or greater force to the

adversary complaint in this case.  *In re FiberMark,* 330 B.R. at 505 (finding that § 107 is

meant to cover all papers filed with the bankruptcy court).  The adversary complaint here

followed the Trustee's Rule 2004 investigation, undertaken upon instructions from Judge

Hardin after the March 24, 2005 letter from the Gianopouloses to Borek came to light.

*See supra*, at 9.  The defendants in the adversary proceeding will have the opportunity to

test the merits of the claims through the litigation process.

### 1.  Scandalous Matter Requires Examination of Relevancy and Improper Purpose

In interpreting § 107(b)(2) courts have considered FED. R. CIV. P. 12(f) which

permits a court to strike from the pleadings material that is redundant, immaterial,

impertinent, or scandalous.  *Gitto,* 422 F.3d. at 12 (observing the similarity between §

107(b) and Rule 12(f)*); Phar-Mor,* 191 B.R. at 678-79 (discussing the court's century old

authority to protect litigants from scandalous or defamatory material and concluding that

Rule 12(f) and § 107(b) share the common premise that "[a] person within the courts'

jurisdiction should not be subject to scandalous or defamatory material submitted under

the guise of a properly pleaded court document"); *Hope on Behalf of Clark v. Pearson (In re Hope),* 38 B.R. 423, 424 (M.D. Ga. 1984) (looking to Rule 12(f) for guidance before ruling on defendant's motion to seal under § 107) (citing 5C CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1382, at 827 (1969)).  Courts are generally reluctant to strike allegedly scandalous matter pursuant to Rule 12(f) unless the movant can show that "no evidence in support of the allegation would be admissible." *Barcher v. New York Univ. Sch. of Law*, 993 F. Supp. 177, 181 (S.D.N.Y. 1998) (denying motion to strike scandalous matter because of the possibility that the plaintiff could testify as to alleged harassment); *see generally* 5C WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1382 (3d ed. 2006).

     The Second Circuit has taken a stringent approach to the application of Rule 12(f) and will generally deny the motion "unless it can be shown that no evidence in support of the allegation would be admissible."  *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) (stating that in denying motion to strike on the basis of immateriality or impertinence, the court "should not tamper with the pleadings unless there is a strong reason for so doing").  For a party to prevail on a Rule 12(f) motion to strike it must be clear from the pleadings that the challenged allegation "has no bearing on the subject matter of the litigation and that [its] inclusion will prejudice the defendants . . . ."  *First City Nat. Bank & Trust Co. v. Fed. Deposit Ins. Co.*, 730 F. Supp. 501, 514 (E.D.N.Y 1990).

Although courts are less reluctant to strike scandalous[16] allegations under Rule

12(f) because it purges the court's files and protects the subject of the allegations, courts

will not strike scandalous statements that offend the sensibilities of the objecting party if

the challenged allegations describe acts or events relevant to the action.  *See* 5C WRIGHT

& MILLER § 1382.  A court's willingness to grant a motion to strike scandalous matter is

partially aimed at avoiding prejudice to the party before a jury.  *Federated Dept. Stores,*

*Inc. v. Grinnell Corp.,* 287 F. Supp. 744, 748 (S.D.N.Y.1968) (discussing withholding

prejudicial pleadings from the jury, but holding that it is best left to the trial judge to

determine what information the jury should or should not be provided); *see generally* 5C

WRIGHT & MILLER § 1382.  But if the case is tried to the court, or if the pleadings are

subject to continuing "judicial supervision," the need to strike is lessened.  *Daggs v.*

*Periodical Publishers' Serv. Bureau, Inc.,* 36 F.R.D. 48 (D. Conn. 1964) (denying motion

to strike offending allegations because case would be tried before the court and therefore

no prejudice would result).

Therefore, it is consistent with well established legal principles to conclude that

the relevance standards articulated in the context of Rule 12(f) apply as well in

determining whether protection is warranted under § 107(b)(2).  Because that section

protects against "scandalous *or* defamatory matter," stated in the disjunctive, the

relevance standard applies in all cases in which sealing is sought.  Such protection does

---

[16]    "Scandalous" matter generally means "any allegation that unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court."  2 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 12.37[3] (3d ed. 2006).

not depend on the truth of the allegedly offending statements.[17]  For that reason there is

no reason to stretch as the *Gitto* court did to engraft relevance concepts on a new category

of potentially untrue statements.

Bankruptcy courts are constrained from importing common law exceptions to

public access because § 107 codifies the public access doctrine and exceptions, without

all of their adornments.  *See* Section III.B., *supra,* at 15-16.  Nevertheless, *Gitto,* 422 F.3d

at 12, derived the "improper purpose" component of its test from the Supreme Court's

decision in *Nixon*, which concluded that the *common law* right of public access had to

give way "where the court files might have become a vehicle for improper purposes."

*See Nixon*, 435 U.S. at 598.  *Orion Pictures Corp.,* also relying on *Nixon,* likewise

recognized an improper purpose exception to public access.  *Orion Pictures Corp.*, 21

F.3d at 27 ("In limited circumstances, courts must deny access to judicial documents −

generally where open inspection may be used as a vehicle for improper purposes.")

(citing *Nixon*, 435 U.S. at 597).

*Nixon* gave examples of circumstances that justified exceptions to the right of

public access to court files: "the common-law right of inspection has bowed before the

power of a court to insure that its records are not 'used to gratify private spite or promote

public scandal' through the publication of 'the painful and sometimes disgusting details

of a divorce case' . . . [or] to permit their files to serve as reservoirs of libelous statements

for press consumption . . . , or as sources of business information that might harm a

---

[17]        Thus, for example, in a garden variety breach of contract case for failure to deliver widgets,
allegations about criminal history or marital infidelity, even if true, would nevertheless be subject to
protection under § 107(b)(2), or a motion to strike under Rule 12(f), on relevance grounds.

litigant's competitive standing . . . ."  435 U.S. at 598 (citations omitted).  The examples

given by the Supreme Court justifying exceptions from public access would appear to fit

easily within the standards for protection against scandalous matter.  Because litigants

frequently assign bad motives to allegations made by their adversaries, the improper

purpose test needs to be applied carefully, hewing closely to the traditional standards for

protecting against scandalous matter.

### 2.  Defamatory Matter Requires Untruth

Neither the statutory language nor the legislative history explains what was meant

by "defamatory matter" in § 107(b)(2).  And unlike "scandalous matter," for which courts

understandably have looked for guidance to FED. R. CIV. P. 12(f), there are no parallel

statutes or rules to examine for the meaning of defamatory matter.  Perhaps that is why

the court in *Gitto* felt free to engraft its own requirements on the standards for

protection.[18]  Courts are instructed in interpreting statutes to give the words of a statute

their plain and ordinary meaning.  *See Garcia v. Teitler*, 443 F.3d 202, 207 (2d Cir.

2006); *cf. United States v. Peterson*, 394 F.3d 98, 106 (2d Cir. 2006) ("Absent a clear

indication to the contrary, we think it plain that Congress intended such well defined

terms as burglary and robbery to have their ordinary meanings.").  With respect to

defining defamatory matter, the law of defamation is extensive and there is no shortage of

authority to draw upon.

---

[18]     According to *Gitto*, 422 F.3d at 11, "[p]apers filed in bankruptcy court do not fall within the §
107(b)(2) exception merely because they would have a detrimental impact on an interested party's
reputation.  Rather, . . . the statute requires something more.  The exact nature of this additional showing is
not apparent, however, from the face of the statute nor from the legislative history. . . . It is therefore left
to the courts to determine the specific contours of the exception."

The Restatement (Second) of Torts § 558 defines the elements of a claim for defamation. Only the first element is important for present purposes: "To create liability for defamation there must be: (a) a false and defamatory statement concerning another." RESTATEMENT (SECOND) OF TORTS § 558(a) (1977). Section 581A provides that "One who publishes a defamatory statement of fact is not subject to liability for defamation if the statement is true." RESTATEMENT (SECOND) OF TORTS § 581A. Comment a to this section explains:

> a. To create liability for defamation there must be publication of matter that is both defamatory and false. (See § 558). There can be no recovery in defamation for a statement that is true, although the statement is made for no good purpose and is inspired by ill will toward the person about whom it is published and is made solely for the purpose of harming him.

RESTATEMENT (SECOND) OF TORTS § 581A cmt. a.[19]

This provides solid footing for imposing a requirement that the defamatory matter prong of § 107(b)(2) protects only against untrue statements. Defamation law leaves no

---

[19] At common law, to create liability for defamation the claimant must establish the following: (1) a false and defamatory statement; (2) unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. *Angio-Medical Corp. v. Eli Lilly & Co.,* 720 F. Supp. 269, 272 (S.D.N.Y. 1989); *Church of Scientology Int'l v. Eli lilliy & Co.,* 778 F. Supp. 661, 666 (S.D.N.Y. 1991); RESTATEMENT (SECOND) OF TORTS § 558 (1977). The gravamen of an action alleging defamation is an injury to reputation. *Celle* v. *Felipino Reporter Enterprises Inc.,* 209 F.3d 163,177 (2d Cir. 2000). The New York Court of Appeals has defined a defamatory statement as one that exposes an individual "to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or . . . induce[s] an evil opinion of one in the minds of right-thinking persons, and . . . deprives one of . . . confidence and friendly intercourse in society." *Celle,* 209 F.3d at 177 (quoting *Kimmerle v. New York Evening Journal,* 262 N.Y. 99 (1933).

Whether a particular statement is defamatory is a question of law for the court. *Church of Scientology,* 778 F. Supp. at 666. New York federal courts follow standards developed by the New York Court of Appeals in determining whether a statement is defamatory. *Celle,* 209 F.3d at 177 (citing *Davis v. Ross,* 754 F.2d 80, 83 (2d Cir. 1985)). First, the court must "give the disputed language a fair reading in the context of the publication as a whole," and should not be read in isolation. *Id.* Second, a fair reading of the statement controls – courts should not strain to find the most innocuous interpretation. *Id.* Finally, the meaning that is reasonably attributable to the intended reader controls. *Id.* (finding that in the context of a published article "the words are to be construed not with the close precision expected from lawyers and judges but as they would be read and understood by the public to which they are addressed").

room for inserting the relevance and improper purpose inquiry that the scandalous matter

prong of § 107(b)(2) more comfortably incorporates.  Nor does defamation law extend its

reach to *potentially* untrue statements.

### D.  Rattet Has the Burden of Proof for Sealing

The Court must grant the motion for protection if the sealing proponent can

demonstrate that the allegations in the complaint are in fact scandalous and defamatory.

*See In re Global Crossing*, 295 B.R. 720, 723 n. 7 (Bankr. S.D.N.Y. 2003) (Gerber, J.)

("As is apparent from the statutory language, and its use of the words 'shall' and 'may,'

respectively, this Court is required to grant that relief upon the motion of a party in

interest, assuming the information is of a type listed in section 107(b) . . . .") (citing

*Orion Pictures Corp.*, 21 F.3d at 27).  The sealing proponent has the burden of proof to

demonstrate the grounds for an exception under § 107(b)(2).  *FiberMark*, 330 B.R. at 497

(holding that the seal proponent has "the burden of proof to demonstrate grounds for an

exception under § 107(b)") (citing *Goldstein v. Forbes (In re Cendent Corp.)*, 260 F.3d

183, 194 (3d Cir. 2001)).  To meet this burden of proof, Rattet must demonstrate

extraordinary circumstances and compelling need to obtain protection.  *Orion Pictures

Corp.*, 21 F.3d at 27.  Rattet's claim that the adversary complaint will tarnish the firm's

reputation, without more, is insufficient to meet this high burden.

With these principles in mind, the Court will examine Rattet's claim that the

adversary complaint should be sealed.

**E.   The Adversary Complaint Contains Matter That May Alter Rattet's
Reputation in the Eyes of a Reasonable Person, But It Is Neither Scandalous
Nor Defamatory**

The adversary complaint contains allegations and claims against Rattet for

fraudulent concealment, conspiracy to commit fraudulent concealment, breach of

fiduciary duty, conspiracy to breach fiduciary duty, negligence and fraud on the court.

Rattet contends that the allegations are untrue and that the "mere placement of this

Complaint on the Court's electronic Filing System/Pacer ('ECF') will irreparably damage

the professional reputation of the Rattet Firm."  Sealing Motion ¶ 5.  It is undisputed that

these allegations could cause Rattet to suffer prejudice, negative publicity or possible

financial adversity as a result of the public filing of this complaint, *see* Trustee's

Memorandum of Law in Opposition to the Motion to Seal, at 11 (ECF Document No.

936), but mere embarrassment or harm caused to the party is insufficient to grant

protection under §107(b)(2).  *See In re Analytical Sys., Inc.*, 83 B.R. 833 (Bankr. N.D.

Ga. 1987) (denying request by both parties to seal settlement agreement because the

agreement, among other things, did not contain scandalous or defamatory matter and at

most the record only supported a finding of possible embarrassment to one of the parties).

"Simply showing that the information would harm the company's reputation is not

sufficient to overcome the strong common law presumption in favor of public access to

court proceedings and records."  *Id.* at 836 (quoting *Brown & Willamson Tobacco Corp.

v. FTC*, 710 F.2d 1165, 1179-80 (6th Cir. 1983)); *In re Muma Services Inc.*, 279 B.R. at

484 ("The provision [§ 107(b)] was not intended to save the debtor or its creditors from

embarrassment, or to protect their privacy in light of countervailing statutory,

constitutional and policy concerns.") (citation omitted); *In re Hope*, 38 B.R. at 424 ("It is

not enough that the matter offends the sensibilities of the objecting party if the challenged

allegations describe acts or events that are relevant to the action.") (quoting 5C WRIGHT & MILLER § 1382); *see generally* 2 COLLIER ON BANKRUPTCY ¶107.3. After carefully reviewing the adversary complaint, the Court concludes that the allegations are neither scandalous nor defamatory. The language in the adversary complaint is not scandalous – there is nothing said that is "grossly disgraceful," *see supra* note 13, at 20, or "that unnecessarily reflects on the moral character of an individual or states anything in repulsive language," *see supra* note 15, at 22. As discussed below, the allegations against Rattet are relevant to the causes of action alleged against Rattet and they are not included for an improper purpose. *See* Section III.E.2., *infra,* at 30-33. Rattet's claim that the allegations will cause harm to its reputation, alone, is insufficient to overcome the public policy interest of keeping court records public. Furthermore, none of the allegations are defamatory within the meaning of § 107 since Rattet has not established that the allegations are untrue.

### 1.   Rattet Has Not Established That the Allegations Are Untrue

Rattet has not established that the allegations directed against it in the adversary complaint are untrue. *See Gitto*, 422 F.3d at 12 ("We therefore emphasize that although a bankruptcy court may grant protection under § 107(b)(2) based on a showing of untruthfulness, protection on this basis is available only in the rare case where the untruthfulness is readily apparent."). The bankruptcy court is not required to resolve questions of truthfulness on a motion to seal, where doing so would require discovery, additional hearings, or would otherwise be burdensome on the court. *Id.* at 11. Rattet's reply papers deny that it engaged in any fraudulent or conspiratorial conduct, and state that it "intends to vigorously defend against these unfounded allegations." Reply to

Trustee's Objection to Motion to Seal ¶ 10 ("Reply") (ECF Document No. 935).  While

including a general denial of misconduct and stating that it intends vigorously to defend

the action, Rattet has not provided clear evidence that *any* offending statement in the

adversary complaint is untrue.  Rather, Rattet complains that by piecing together facts

about the failed auction process, Rattet's representation of Borek and his affiliates in

other matters, and the revelations about the involvement of Borek and the Gianopouloses

in connection with the 64 East bid, the Trustee has created a false impression about

Rattet's role in these events.  The Sealing Motion and Reply instead seek to cast blame

on other defendants.  The time and place to test the claims and defenses must await future

proceedings.[20]

### 2.  The Challenged Statements in the Adversary Complaint Are Relevant and Were Not Included for an Improper Purpose

The Court has carefully reviewed the adversary complaint, as well as the briefs

and docket entries referenced above.  I conclude that the allegations in the adversary

complaint are relevant to the causes of action alleged against Rattet and were not

included for an improper purpose.  *See In re Commodore Corp.*, 70 B.R. 543, 546

(Bankr. N.D. Ind. 1987) (denying motion to strike under § 107(b)(2) because statements

alleged to be scandalous and defamatory were made in support of the allegations that

movant was not a disinterested party).

---

[20]     The Court has rejected that portion of the *Gitto* test that would qualify a challenged statement for protection under §107(b)(2) where "(1) the material at issue would alter his reputation in the eyes of a reasonable person, and (2) . . . it is potentially untrue and irrelevant or included for an improper end." *Gitto*, 422 F.3d at 16-17.  If the Court were to apply the *Gitto* test here, I nevertheless conclude that nothing in the adversary complaint is potentially untrue and irrelevant or included for an improper end.  *See* Section III.E.2.a) & b), *infra*, at 31-34, for a discussion of relevance and improper purpose.  In the context of an adversary proceeding, the "potentially untrue" standard is particularly inappropriate because allegations in a complaint are often disputed; that is part of the very nature of the adversarial process.

### a)  The Contested Allegations Are Relevant

Paragraph 49 of the Sealing Motion challenges the basis for the allegations in the adversary complaint that Rattet was not "disinterested" as a result of Rattet's past connections with Borek.  Rattet complains that the adversary complaint should have added that Borek had no involvement with the Debtors' assets until after March 2005.[21] Sealing Motion ¶ 49.  Rattet argues that this *omission* makes the allegations of the adversary complaint "seriously misleading in that the complaint implies . . . that the Rattet Firm was promoting Mr. Borek's interest in direct conflict with the interests of the estates."  *Id.*  Indeed, the adversary complaint fairly read does allege that while representing the Debtors, Rattet acted for the benefit of Borek, and it supports the allegations with references to specific events and documents.  Rattet concedes that paragraphs 44-52 of the adversary complaint correctly recites the timeline for retention of the Rattet firm, and it further states that between March 9, 2005 and March 22 or 23, 2005, Borek expressed an interest in purchasing the Debtor's assets.  Sealing Motion ¶ 50.  Rattet asserts that the adversary complaint makes scandalous allegations of wrongdoing by Rattet by inferring that Rattet acted with an interest adverse to the Debtors, when a close reading of the timeline shows no wrongdoing by the firm.  Sealing Motion ¶ 50.  Rattet may prevail in demonstrating that it always acted properly.  But the allegations in paragraphs 47-53 of the adversary complaint fairly raise questions about Rattet's current and prior relationship with Borek, arguably giving rise to divided loyalties; they also raise questions whether Rattet properly supplemented its Rule 2014 disclosures to "disclose conflicts or potential conflicts or connections with the debtor,

---

[21]     Rattet concedes that it rendered legal services to Borek or his affiliates through March 9, 2005. Sealing Motion ¶ 50.

creditors, or any other party in interest that arise after counsel's initial application." Proposed Adversary Complaint ¶ 43.  In the context of the claims asserted in the adversary complaint, the Court finds that these statements in the adversary complaint are not irrelevant.

Rattet also takes issue with the allegations in paragraphs 54-57 of the adversary complaint.  These allegations relate to Rattet's failure to disclose its prior representation of Nodine Realty, an entity owned or controlled by the Gianopouloses, in Nodine's 2002 chapter 11 filing.  Proposed Adversary Complaint ¶¶ 54, 55.  Rattet claims the allegations are "irrelevant and scandalous," since the prior chapter 11 proceeding opened and closed more than a year before the filing of the Debtors' chapter 11 case.  Sealing Motion ¶ 51. The adversary complaint challenges Rattet's independence before and during its representation of the Debtors because of Rattet's past and present "connections" with the Gianopouloses and Borek.  Rattet does not contend that the allegations about the legal representations are untrue.  They are clearly relevant to the claims the Trustee has asserted against Rattet; in this context, the allegations cannot be considered to be scandalous.  FED. R. BANKR. P. 2014(a) requires an attorney seeking to be retained to submit an application to the U.S. Trustee setting forth "to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, [or] any other party in interest . . . ."  If Rattet failed to comply with the rule − a matter not yet decided − as the Trustee alleges, the firm's independence may be challenged in the adversary proceeding.  Since it is undisputed that these "connections" were not included in Rattet's retention application, or in any supplement, the omission may be relevant to the claims asserted in the adversary complaint.

Finally, paragraph 52 of the Sealing Motion contends that the adversary complaint "seeks to tar the Rattet Firm with innuendo that since Mr. Rattet was a long-time friend of Mr. Borek, and by total coincidence Mr. Borek had business dealings with the Gianopouloses, that the Rattet Firm orchestrated a conspiracy to strip the Estate of assets." Sealing Motion ¶ 52. To counter these allegations, Rattet directs the Court to the March 22, 2005 Warning Letter from Rattet to Borek as proof that Rattet did not sanction 64 East's impropriety. Sealing Motion ¶ 52.[22] Paragraphs 79-85 of the adversary complaint allege that this letter shows, at the very least, that Rattet was aware of the Gianopolouses' possible involvement in the 64 East bid, and despite Rattet's obligation to the Court to disclose such impropriety, Rattet failed to make any disclosures to the Court. At a minimum, the letter and the related allegations in the adversary complaint support the Trustee's claim for negligence and possible fraud on the court.[23]

### b) The Contested Allegations Were Not Included for an Improper Purpose

Rattet contends that the Trustee included the allegations of wrongdoing by Rattet to cover up for the Trustee's error in releasing and returning 64 East's $2.1 million escrow deposit without a court order. The Sealing Motion and Reply assert that Rattet

---

[22]     The relevant paragraph provides:

> Please pay particular attention to Paragraph "5" of the Settlement Agreement with respect to transfer of the Franchises. Because subparagraph "E" and "F" of the Paragraph "5" require an "arms-length transaction" and that the transferee cannot be "associated in any ways with the past or present management", I strongly urge you to ensure that Tom and/or Gus have individual bankruptcy counsel in connection with any security provided to you or otherwise, and insist that they do so.

Proposed Adversary Complaint, Ex. L, at 1.

[23]     Rattet's Reply reads more like a Rule 12(b)(6) motion to dismiss some or all of the claims for failure to state a claim than as a reply to the Trustee's opposition to the Sealing Motion. Nothing in this Opinion is intended to foreclose (or encourage) arguments on any motion to dismiss.

intends to assert counter claims against the Trustee.[24]  The adversary complaint includes

specific allegations of steps taken (unsuccessfully) by Rattet to obtain not only a return of

the deposit to 64 East, but also a complete release of 64 East for any claims arising out of

the proposed auction.  In the context of the claims asserted, and the largely undisputed

facts regarding the failed auction, the Court concludes that the challenged statements in

the adversary complaint are relevant and not asserted for an improper purpose.

### F.  Most of the Facts Alleged in the Adversary Complaint Are Already Public

The Court finds further support for its decision to permit the adversary complaint

to be filed as part of the Court's public records because the vast majority of the facts on

which the Trustee bases the allegations in the adversary complaint are already part the

public record,[25] or were obtained as a result of the voluntary turnover of files, or as a

result of the FED. R. BANKR. P. 2004 investigation ordered by Judge Hardin.  The Court

lacks the authority to seal information derived from public documents.  *U.S. v.*

*Continental Airlines, Inc. (In re Continental Airlines),* 150 B.R. 334, 339 (D. Del. 1993)

(stating that the court lacks the authority to seal material in a fee reviewer's report which

contains factual information based on public records; "there is nothing to be gained nor is

anyone to be protected by [the report's] closure") (citing *In re Overmeyer,* 24 B.R. 437,

---

[24]    Rattet seems to believe that the best defense is a "good" offense, a tactic one may question in the context of this case, but Rattet should be careful to assure that its offense is "good," and not just offensive. The adversary complaint, while raising serious allegations of wrongdoing in connection with the Court-ordered auction, is largely written in bland prose, supported by numerous exhibits; the Sealing Motion and Reply, on the other hand, are full of intemperate language.

[25]    The following documents, among others arguably relevant to the adversary complaint, are public records and can be found on ECF: (1) the letter dated 3/24/2005 letter read into the record by Judge Hardin on 3/15/2006, exposing the Gianopolouses interest in the 64 East bid; (2) the Affidavit of No Adverse Interest, submitted by the Rattet Firm (ECF Docket No. 5); (3) the settlement agreement between Dunkin Donuts Inc. and the Debtors (ECF Docket No. 33); (4) Consent Order signed on 2/22/2005 granting the motion authorizing the Debtors to Conduct an auction of Substantially all of The Debtors' interests (ECF Docket No. 241); (5) the Form purchase and sale agreement relating to the Sale of Debtor's assets.

442 (Bankr. S.D.N.Y. 1982)) (holding that court filings containing references to matters already "of public record . . . can hardly be characterized as confidential, scandalous or defamatory matters").

## IV. Conclusion

The adversary complaint contains serious allegations of misconduct by lawyers representing the Debtors and other parties in interest in this chapter 11 case, as well as by the Debtors' principals and by other third parties.  In addition to Rattet and several of its partners, the defendants include Borek's attorneys, who also allegedly had "notice or knowledge" of the Gianopouloses involvement with Borek in 64 East's bid, failed to disclose the facts, and indeed may have assisted in documenting the allegedly improper agreement between the Gianopouloses and Borek.  None of these lawyers – or for that matter any of the other defendants – has had an opportunity to respond to the allegations contained in the adversary complaint.  At this point the allegations remain unproven.  But the public interest in this adversary proceeding cannot be questioned, as the allegations relate to the integrity and transparency of the bankruptcy court proceedings.  Whether the adversary complaint has properly stated claims, and whether the claims have any merit, must await future developments.  For now, however, it is clear that there is no basis to afford Rattet protection under 11 U.S.C. § 107(b)(2).  Therefore, the Sealing Motion is **DENIED**.

/ / / / / /

/ / / / / /

/ / / / / /

35

The Trustee shall promptly file and serve the adversary complaint.  The Trustee's

counsel shall also file and serve a status report regarding the adversary proceeding within

30 days after the filing of this Opinion.  A scheduling order will thereafter be entered.

**IT IS SO ORDERED.**

DATED:        February 13, 2007
              New York, New York

**_/s/Martin Glenn_**
MARTIN GLENN
United States Bankruptcy Judge